**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com
         jwilner@bursor.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAUREN MORGAN, individually and on behalf of all others similarly situated,<br><br>                              Plaintiff,<br><br>        v.<br><br>HIPPO HOLDINGS, INC. and HIPPO ANALYTICS, INC.,<br><br>                              Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><u>**DEMAND FOR JURY TRIAL**</u> |

Plaintiff Lauren Morgan ("Plaintiff") brings this class action complaint individually and on behalf of all others similarly situated (the "Class Members") against Hippo Holdings, Inc. and Hippo Analytics, Inc. (collectively, "Defendants" or "Hippo"). Plaintiff's allegations are based upon personal knowledge of the facts pertaining to herself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

**NATURE OF THE ACTION**

1.      This is a class action lawsuit brought on behalf of all persons who have accessed and used www.hippo.com (the "Website"), to apply for an insurance policy.

2.      Hippo sells property insurance policies to consumers through its Website, where applicants can compare insurance rates and receive quotes for various property insurance policies. In order to apply for an insurance policy through the Website, applicants must share personally identifying information, including their home address and housing status. When consumers provide this information on their applications, they expect that such confidential information and activity will be protected and not disclosed to unknown third parties. Such expectations are based, in part, on the legal protections afforded to such information.

3.      Despite reasonable expectations of privacy, and Defendants' legal duties to prevent the disclosure of such private information, Defendants disclose information provided by consumers on insurance policy quote requests to LinkedIn Corporation ("LinkedIn") and Google LLC ("Google"). These disclosures include communications that contain sensitive and confidential information – i.e., "nonpublic personal information," as defined by 16 C.F.R. § 313.3 (the "Gramm-Leach-Bliley Act" or "GLBA"), Cal. Fin. Code § 4050, et seq. (the "California Financial Information Privacy Act" or "CalFIPA"), and Cal. Ins. Code § 791, et seq. (the California "Insurance Information and Privacy Protection Act" or "IIPPA").

4.      Through the acts alleged herein, Defendants violated the Electronic Communications Privacy Act, 18 U.S.C. 2511, *et seq*. ("ECPA") and the California Invasion of Privacy Act ("CIPA") § 631(a) by disclosing Plaintiff's and Class Members' private and confidential information without consent.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                                1

**PARTIES**

5.     Plaintiff Lauren Morgan is a resident and citizen of Huntington Beach, California. In or around September 2023, Plaintiff applied for a quote for homeowners insurance on the Website.  During the application process, Defendants required Plaintiff to provide private information related to her application.

6.     Plaintiff applied for an insurance policy through the Website while in California using the same device and browser used to access her LinkedIn and Google accounts.  When creating her LinkedIn account, Plaintiff provided certain information to LinkedIn, including her full name. When creating her Google account, Plaintiff provided certain information to Google, including her full name and date of birth.  Google also collected information related to her browser and device every time she logged into her Google account, including her IP address and other personally identifying information related to her device.

7.     Unbeknownst to Plaintiff, Defendants disclosed her personally identifiable information ("PII") to LinkedIn and Google—including communications that contained Plaintiff's confidential, "nonpublic personal information" as defined by the GLBA, CalFIPA, and IIPPA. Neither Defendants, nor LinkedIn, nor Google procured Plaintiff's prior consent to the sharing of his private and protected information.

8.     Plaintiff did not become aware that her information and communications were intercepted by Google and LinkedIn until July 2025.

9.     Defendant Hippo Holdings, Inc. is a Delaware corporation with its principal place of business at 150 Forest Avenue, Palo Alto, California 94301.

10.     Defendant Hippo Analytics, Inc. is a Delaware corporation with its principal place of business at 150 Forest Avenue, Palo Alto, California 94301.

11.     Hippo is a provider of property insurance services including insurance quotes and insurance policies, to individuals throughout the United States, including in California.  Hippo also provides a variety of insurance services to Californians, whom it knows to reside in the State based on address information that individuals must provide in order to request an insurance quote or

purchase an insurance policy with Hippo.  Hippo chose to embed the LinkedIn Insight Tag and Google tracking technologies on its Website, which it owns and operates.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the Electronic Communications Privacy Act, 18 U.S.C. § 2511).  This Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.  Further, this action is a putative class action, and Plaintiff alleges that at least 100 people comprise the proposed class, that the combined claims of the proposed class members exceed $5,000,000 exclusive of interest and costs, and that at least one member of the proposed class is a citizen of a state different from the Defendants.

13.    This Court has personal jurisdiction over the parties because Plaintiff resides in California, is a California citizen, and submits to the jurisdiction of the Court.  Further, the Defendants are residents of California and have, at all times relevant hereto, systematically and continually conducted business in California, including within this District, and intentionally availed themselves of the benefits and privileges of the California consumer market through the promotion, marketing, and operation of their services to residents within this District and throughout California.  Additionally, Plaintiff, while in California, requested an insurance quote through Defendants' Website.

14.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the Defendants transacts significant business within this District, Defendants reside in this District, and the acts that gave rise to this cause of action occurred within this District.

## FACTUAL BACKGROUND

### I.    The California Invasion of Privacy Act

15.    The California Legislature enacted the Invasion of Privacy Act to protect certain privacy rights of California citizens.  The legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."  Cal. Penal Code § 630.

16.     The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call*." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

17.     Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas v. Clark*, 38 Cal. 3d 355, 360-61 (1985) (emphasis added, internal citations omitted).

18.     As part of CIPA, the California Legislature enacted § 631(a), which prohibits any person or entity from [i] "intentionally tap[ping], or mak[ing] any unauthorized connection … with any telegraph or telephone wire," [ii] "willfully and without the consent of all parties to the communication … read[ing], or attempt[ing] to read, or to learn the contents or meaning of any . . . communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [California]," or [iii] "us[ing], or attempt[ing] to use . . . any information so obtained."

19.     CIPA § 631(a) also penalizes those who "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

20.     Individuals may bring an action against the violator of CIPA for $5,000 per violation. Cal. Penal Code § 637.2(a)(1).

## II.    The Gramm-Leach-Bliley Act and California Financial Information Privacy Act

21.    As Congress and the California Legislature recognized, "nonpublic personal information" is confidential.

22.    Per 16 C.F.R. § 313.3(n):

(1) Nonpublic personal information means:

(i)    Personally identifiable financial information; and

(ii)    Any list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived using any personally identifiable financial information that is not publicly available.

23.    Per 16 C.F.R. § 313.3(o):

(1) Personally identifiable financial information means any information:

(i)    A consumer provides to [a financial institution] to obtain a financial product or service from [a financial institution];

(ii)    About a consumer resulting from any transaction involving a financial product or service between [a financial institution] and a consumer; or

(iii)    [A financial institution] otherwise obtain[s] about a consumer in connection with providing a financial product or service to that consumer.

(2) Examples—(i) Information included. Personally identifiable financial information includes:

(A)    Information a consumer provides to [a financial institution]on an application to obtain a loan, credit card, or other financial product or service;

(B)    Account balance information, payment history, overdraft history, and credit or debit card purchase information;

(C)    The fact that an individual is or has been one of [a financial institution's] customers or has obtained a financial product or service from [a financial institution];

(D)    Any information about [a financial institution's] consumer if it is disclosed in a manner that indicates that the individual is or has been [a financial institution's] consumer;

(E)    Any information that a consumer provides to [a financial institution] or that [a financial institution]or [its] agent otherwise obtain[s] in connection with collecting on, or servicing, a credit account; and

(F) Any information [a financial institution] collect[s] through an Internet "cookie" (an information collecting device from a web server).

24. Pursuant to 16 C.F.R. § 313.3(k)(1):

a financial institution "means any institution the business of which is engaging in an activity that is financial in nature or incidental to such financial activities as described in section 4(k) of the Bank Holding Company Act of 1956, 12 U.S.C. 1843(k). An institution that is significantly engaged in financial activities, or significantly engaged in activities incidental to such financial activities, is a financial institution."

25. Pursuant to 16 C.F.R. § 313.3(k)(1), Hippo is a financial institution.

26. In passing CalFIPA, the California Legislature "intend[ed] for financial institutions to provide their consumers notice and meaningful choice about how consumers' nonpublic personal information is shared or sold by their financial institutions[]" and "inten[ded] . . . to afford persons greater privacy protections than those provided in Public Law 106-102, the federal Gramm-Leach-Bliley Act[.]" Cal. Fin. Code § 4051(a)-(b).

27. Cal. Fin. Code § 4052(a) provides that:

"Nonpublic personal information" means personally identifiable financial information (1) provided by a consumer to a financial institution, (2) resulting from any transaction with the consumer or any service performed for the consumer, or (3) otherwise obtained by the financial institution.

28. According to Cal. Fin. Code § 4052(b):

"Personally identifiable financial information" means information (1) that a consumer provides to a financial institution to obtain a product or service from the financial institution, (2) about a consumer resulting from any transaction involving a product or service between the financial institution and a consumer, or (3) that the financial institution otherwise obtains about a consumer in connection with providing a product or service to that consumer. Any personally identifiable information is financial if it was obtained by a financial institution in connection with providing a financial product or service to a consumer. Personally identifiable financial information includes all of the following:

(1) Information a consumer providers to a financial institution on an application to obtain a loan, credit card, or other financial product or service.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    6

(2)    Account balance information, payment history, overdraft history, and credit or debit card purchase information.

(3)    The fact that an individual is or has been a consumer of a financial institution or has obtained a financial product or service from a financial institution.

(4)    Any information about a financial institution's consumer if it is disclosed in a manner that indicates that the individual is or has been the financial institution's consumer.

(5)    Any information that a consumer provides to a financial institution or that a financial institution or its agent otherwise obtains in connection with collecting on a loan or servicing a loan.

(6)    Any personally identifiable financial information collected through an Internet cookie or an information collecting device from a Web server.

29. "Except as provided in Sections 4053, 4054.6, and 4056, a financial institution shall not sell, share, transfer, or otherwise disclose nonpublic personal information to or with any nonaffiliated third parties without the explicit prior consent of the consumer to whom the nonpublic personal information relates." Cal. Fin. Code § 4052.5.

30. Thus, Plaintiff's and Class Members' "nonpublic personal information" is confidential, under both federal and California law. Nonetheless, such information was intercepted in transit by the LinkedIn Insight Tag and Google's tracking technologies—as enabled by Defendants—and none of the parties, neither Defendants, nor LinkedIn, nor Google, procured Plaintiff's and Class Members' consent prior to this interception.

31. This pattern of conduct by Defendants flouts the GLBA's and CalFIPA's respective purposes of enhancing "financial privacy[.]"[1]

## III.    California Insurance Information and Privacy Protection Act

32. The California Legislature enacted the Insurance Information and Privacy Protection Act (IIPPA), Cal. Ins. Code § 791, to "establish standards for the collection, use and disclosure of information gathered in connection with insurance transactions by insurance

---

[1] http://www.leginfo.ca.gov/pub/03-04/statute/ch_0201-0250/ch_241_st_2003_sb_1. *See also* https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=200320040SB1.

institution, … to maintain a balance between the need for information by those conducting the business of insurance and the public's need for fairness in insurance information practices, including the need to minimize intrusiveness [and] to limit the disclosure of information collected in connection with insurance transactions."  Importantly, the Act creates privacy protections for individuals in insurance transactions by regulating how the insurance industry collects, uses, and discloses personal information.

33.     The IIPPA prohibits the unauthorized disclosure of "any personal or privileged information about an individual collected or received in connection with an insurance transaction." Cal. Ins. Code § 791.13.  "Personal information" is defined as "any individually identifiable information gathered in connection with an insurance transaction from which judgments can be made about an individual's character, habits, avocations, finances, occupation, general reputation, credit, health, or any other personal characteristics[, including] an individual's name and address and 'medical record information.'"  Cal. Ins. Code § 791.02(s).

34.     As relevant here, California has a strong and explicit legislative intent to protect Californians from the disclosure of personal information that is shared in insurance transactions.

**IV.     Overview of Defendants' Website**

35.     Defendants own and operate the Website.  Unbeknownst to consumers, Defendants have integrated the LinkedIn Insight Tag and Google's wiretaps into the Website to assist with Hippo's marketing efforts.

36.     On the Website users can, *inter alia*, request insurance quotes and purchase insurance policies.  When doing so, Website users provide Defendants with confidential information, including "nonpublic personal information" under the GLBA, CalFIPA, and IIPPA such as their PII (*e.g.* their home addresses and housing status) and information about their financial activity with Hippo (*e.g.* application status).

37.     Unbeknownst to Plaintiff and Class Members, however, Defendants aid, agree with, employ, or otherwise enable LinkedIn and Google to eavesdrop on those confidential communications.

38.     Website users' confidential communications are the product of Website users

affirmatively entering, and interacting with, information on the Website (*i.e.*, the confidential communications are not procedurally or automatically generated). Instead, as set out below, the confidential communications stem from Website users typing into data fields, conveying responses to questions and prompts, and actively making other selections. All of the foregoing is information created through the intent of Website users: information created by and in response to Website users' communicative inputs; information created by and in response to Website users' intended messages to the Website and Defendants; and information created by and in response to Website users' having conveyed and expressed their respective desires that the Website would supply them with certain, highly personalized, types of information and/or responses.

39. Because of the way the wiretaps are configured, each interception happens in real time as the information is entered into the website by a consumer.

## V.    Defendants Disclose Consumers' Private Information to LinkedIn and Google

### A.    LinkedIn's Platform and Business Tools

40. LinkedIn markets itself as "the world's largest professional network on the internet[.]"[2]  But LinkedIn is no longer simply a tool to help users find jobs or expand their professional network. LinkedIn has moved into the marketing and advertising space, and boasts of its ability to allow potential advertisers to "[r]each 1 billion+ professionals around the world" via its Marketing Solutions services.[3]  Recently, LinkedIn was projected as being responsible for "roughly 0.9 percent of the global ad revenue" which included approximately $5.91 billion in advertising revenue in 2022.[4]

41. According to LinkedIn, "[t]argeting is a foundational element of running a successful advertising campaign — [g]etting your targeting right leads to higher engagement, and

---

[2] LINKEDIN, WHAT IS LINKEDIN AND HOW CAN I USE IT?, https://www.linkedin.com/help/linkedin/answer/a548441#.

[3] LINKEDIN, MARKETING SOLUTIONS, https://business.linkedin.com/marketing-solutions.

[4] Valentina Dencheva, *LinkedIn annual ad revenue 2017-2027*, STATISTA (Dec. 12, 2023), https://www.statista.com/statistics/275933/linkedins-advertising-revenue.

ultimately, higher conversion rates." [5]  Targeting refers to ensuring that advertisements are targeted to, and appear in front of, the target demographic for an advertisement.  To that end, LinkedIn's Marketing Solutions services allow potential advertisers to "[b]uild strategic campaigns" targeting specific users.[6]  LinkedIn's "marketing solutions allow advertisers to select specific characteristics to help them reach their ideal audience.  The ads [users] see on LinkedIn are then targeted to provide content relevant to [the users]."[7]

42.    As a result of its activities and operation of the LinkedIn Insight Tag, LinkedIn is able to make extremely personal inferences about individuals' demographics, intent, behavior, engagement, interests, buying decisions, and more.[8]

43.    The personal information and communications obtained by LinkedIn are used to fuel various services offered via LinkedIn's Marketing Solutions including Ad Targeting, Matched Audiences, Audience Expansion, and LinkedIn Audience Network.[9]

44.    Such information is extremely valuable to marketers and advertisers because the inferences derived from users' personal information and communications allow marketers and advertisers, including providers of financial products and services, to target potential customers.[10]

---

[5] LINKEDIN, REACH YOUR AUDIENCE: TARGETING ON LINKEDIN, p.3, https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/resources/pdfs/linkedin-targeting-playbook-v3.pdf.

[6] LINKEDIN, *supra* note 33.

[7] LINKEDIN, LINKEDIN ADS AND MARKETING SOLUTIONS, https://www.linkedin.com/help/lms/answer/a421454.

[8] *See* LINKEDIN, MARKETING SOLUTIONS, https://business.linkedin.com/marketing-solutions/audience ("Target audiences through demographic marketing[,]" "Zero in on intent, behavior, engagement, interests, and more[,]" and "Reach the LinkedIn audience involved in the buying decision").

[9] *See id.*

[10] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy ("We serve you tailored ads both on and off our Services. We offer you choices regarding personalized ads, but you cannot opt-out of seeing other ads."); LINKEDIN, ACCOUNT TARGETING, https://business.linkedin.com/marketing-solutions/ad-targeting ("Target your ideal customer based on traits like their job title, company name or industry, and by professional or personal interests"); LINKEDIN, EXAMPLES OF TRENDING AND BEST-IN-CLASS HEALTHCARE CAMPAIGNS AND CONTENT, p.6, https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/healthcare-microsite/resources/lkin-lms-sales-healthcare-campaigns-trending-content-Jan2023.pdf ("BD zeroed in on the end-benefit with a 30 second video introducing their PIVO needle-free blood collection device to potential customers."); LINKEDIN, HEALTHCARE SOCIAL MEDIA STRATEGIES FOR 2023, p.1, https://business.linkedin.com/content/dam/me/business/en-us/marketing-

---

45.     For example, through the use of LinkedIn's Audience Network, marketers and advertisers are able to expand their reach and advertise on sites other than LinkedIn to "reach millions of professionals across multiple touchpoints."[11]  According to Broc Munro of Microsoft, "[w]e gravitate towards social platforms like LinkedIn to achieve more targeted marketing engagement. However, we know that our audiences don't spend all their time on social media. LinkedIn Audience Network enables us to expand our reach to trusted sites while still respecting our audience targeting. This increases the impact of our advertising."[12]

46.     In July 2022, "LinkedIn Marketing Solutions surpassed $5 billion in annual revenue[.]"[13]  That figure is "expected to further grow to reach 10.35 billion U.S. dollars by 2027."[14]

47.     According to LinkedIn, the LinkedIn Insight Tag, also called the Insight Tag is "[a] simple code snippet added to [a] website [that] can help you optimize your campaigns, retarget your website visitors, and learn more about your audiences."[15]  LinkedIn represents that the LinkedIn Insight Tag "enable[s] in-depth campaign reporting and unlock[s] valuable insights about your website visitors."[16]

48.     LinkedIn's current iteration of its Insight Tag is a JavaScript-based code which allows for the installation of its software.[17]  A critical feature allows the LinkedIn Insight Tag to

---

solutions/healthcare-microsite/resources/hc-social-media-trends.pdf (listing "potential customers" as "Common audiences" for insurance sector).

[11] LINKEDIN, ACCOUNT TARGETING, https://business.linkedin.com/marketing-solutions/ad-targeting.

[12] LINKEDIN, LINKEDIN AUDIENCE NETWORK, https://business.linkedin.com/marketing-solutions/native-advertising/linkedin-audience-network.

[13] *LinkedIn Business Highlights from Microsoft's FY22 Q4 Earnings*, LINKEDIN PRESSROOM (July 25, 2022), https://news.linkedin.com/2022/july/linkedin-business-highlights-from-microsoft-s-fy22-q4earnings#:~:text=And%20LinkedIn%20Marketing%20Solutions%20surpassed,revenue%20for%20the%20first%20time.

[14] Dencheva, *supra* note 34.

[15] LINKEDIN, INSIGHT TAG, https://business.linkedin.com/marketing-solutions/insight-tag.

[16] LINKEDIN, LINKEDIN INSIGHT TAG FAQS, https://www.linkedin.com/help/lms/answer/a427660.

[17] LINKEDIN, *supra* note 45.

---

track users, even when third-party cookies are blocked.[18]   LinkedIn "recommend[s] using the JavaScript-based Insight Tag or Conversions API" because third-party cookie settings are being deprecated across the industry.[19]  Embedding the JavaScript as a first-party cookie causes users' browsers to treat the LinkedIn Insight Tag as though it is offered by the website being visited, rather than by LinkedIn.  Doing so ensures that the third-party cookie-blocking functions of modern web browsers do not prevent LinkedIn from collecting data through its Pixel.[20]  Instead, the LinkedIn Pixel is shielded with the same privacy exemptions offered to first-party cookies.

49.     When a user who has signed in to LinkedIn (even if the user subsequently logs out) is browsing a website where the LinkedIn Insight Tag has been embedded, an HTTP request is sent using cookies, which includes information about the user's actions on the website.

50.     These cookies also include data that differentiate users from one another and can be used to link the data collected to the user's LinkedIn profile.

51.     The HTTP request about an individual who has previously signed into LinkedIn includes requests from the "li_sugr" and "lms_ads" cookies.  Each of these cookies are used by LinkedIn "to identify LinkedIn Members off LinkedIn" for advertising purposes.[21]

52.     For example, the "li_sugr" cookie is "[u]sed to make a probabilistic match of a user's identity."[22]  Similarly, the "lms_ads" cookie is "[u]sed to identify LinkedIn Members off LinkedIn for advertising."[23]

53.     A LinkedIn profile contains information including an individual's first and last name, place of work, contact information, and other personal details.  Based on information it obtains through the LinkedIn Insight Tag, LinkedIn is able to target its account holders for advertising.

---

[18] *Id.* ("It's important for advertisers to prepare for these changes by switching to JavaScript tags and enabling 'enhanced conversion tracking' in the Insight Tag settings to continue capturing signals where 3rd party cookies are blocked.").

[19] *See id.*

[20] *See id.*

[21] LINKEDIN, LINKEDIN COOKIE TABLE, https://www.linkedin.com/legal/l/cookie-table.

[22] *See id.*

[23] *See id.*

---

54.     LinkedIn never receives consent from users to intercept and collect electronic communications containing their sensitive and unlawfully-disclosed information.  In fact, LinkedIn expressly warrants the opposite.

55.     When first signing up, a user agrees to the User Agreement.[24]  By using or continuing to use LinkedIn's Services, users agree to two additional agreements: the Privacy Policy[25] and the Cookie Policy.[26]  For California residents, LinkedIn also publishes a California Privacy Disclosure.[27]

56.     LinkedIn's Privacy Policy begins by stating that "LinkedIn's mission is to connect the world's professionals . . . . Central to this mission is our commitment to be transparent about the data we collect about you, how it is used and with whom it is shared."[28]

57.     The Privacy Policy goes on to describe what data LinkedIn collects from various sources, including cookies and similar technologies.[29]  LinkedIn states "we use cookies and similar technologies (e.g., pixels and ad tags) to collect data (e.g., device IDs) to recognize you and your device(s) on, off and across different services and devices where you have engaged with our Services. We also allow some others to use cookies as described in our Cookie Policy."[30]

58.     However, LinkedIn offers an express representation: "**We will only collect and process personal data about you where we have lawful bases.**"[31]

59.     Despite this explicit representation, Defendants unlawfully disclosed sensitive and protected information to LinkedIn in violation of state and federal privacy laws.

---

[24] LINKEDIN, USER AGREEMENT, https://www.linkedin.com/legal/user-agreement.

[25] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy.

[26] LINKEDIN, COOKIE POLICY, https://www.linkedin.com/legal/cookie-policy.

[27] LINKEDIN, CALIFORNIA PRIVACY DISCLOSURE, https://www.linkedin.com/legal/california-privacy-disclosure.

[28] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy.

[29] *Id.*

[30] *Id.*

[31] *Id.* (emphasis added).

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    13

60. Users never choose to provide sensitive information to LinkedIn because, among other reasons, they never know whether a particular website uses the LinkedIn Insight Tag, and, if so, what sensitive personal data it collects or receives.

**B.** **Google's Advertising Technology**

61. Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications. Each device (e.g., computer, tablet, laptop, or smartphone) accesses web content through a web browser (e.g., Chrome, Safari, Edge, etc.).

62. Every website is hosted by a computer server that holds the website's contents and through which the entity in charge of the website exchanges communications with the consumer's device via web browsers.

63. Web communications consist of HTTP Requests and HTTP Responses and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- HTTP Request: an electronic communication sent from a device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

- Cookies: a small text file that can be used to store information on the device which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

- HTTP Response: an electronic communication that is sent as a reply to the device's web browser from the host server in response to a HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.

64.    A consumer's HTTP Request essentially asks the Website to retrieve certain information (such as application information), and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons, and other features that appear on the consumer's screen as they navigate the Website).

65.    Every website is comprised of Markup and "Source Code." Source Code is a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

66.    Source Code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user. The tracking technologies embedded on the Website by Defendants, including Google Analytics, constitute Source Code and function in a substantially similar way to the process described above.

67.    Google is one of the most valuable publicly traded companies in the world with a market capitalization of over $1 trillion dollars. Google fancies itself a "tech" company, but Google, at its core, is an advertising company.

68.    Google "make[s] money" from "advertising products [that] deliver relevant ads at just the right time," generating "revenues primarily by delivering both performance advertising and brand advertising."32 In 2020, Google generated $146.9 billion in advertising revenue, which amounted to more than 80 percent of Google's total revenues for the year. Google generated an even higher percentage of its total revenues from advertising in prior years:

**Table 1**:

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
|------|--------------|------------|--------------|
| 2021 | $257.6 billion | $209.5 billion | 81.33% |
| 2020 | $182.5 billion | $146.9 billion | 80.49% |
| 2019 | $161.9 billion | $134.8 billion | 83.29% |

---

[32] ALPHABET INC., ANNUAL REPORT (FORM 10-K) (Feb. 2, 2021), available at https://www.sec.gov/Archives/edgar/data/1652044/000165204421000010/goog-20201231.htm.

| 2018 | $136.8 billion | $116.5 billion | 85.12% |

69.     Google offers several analytics products, including SDKs and a tracking pixel, which exist solely to help drive ad revenue.  For instance, Google's SDK and pixel integrate with Google's advertising offerings, such as Google Ads, Search Ads 360, Google Cloud, and Google Ad Manager, to direct more individuals to use Google's ad network and products increasing Google's overall ad revenue.  Products like Google's SDK and its tracking pixel also improve the company's advertising network and capabilities by providing more wholesome profiles and data points on individuals.

70.     One of these SDKs and tracking pixels is Google Analytics. Google first launched a version of Google Analytics in 2005 as a tool for website traffic analysis.  In 2007, Google launched Google Analytics Synchronous code with new tracking functionality, such as the ability to track commerce transactions.  Two years later, Google launched the Google Analytics Asynchronous code, which allowed webpages to load faster and improved data collection and accuracy.

71.     Google continued updating its analytics platform, launching Universal Analytics in 2012.  Universal Analytics offered new tracking codes and tools that provided more in-depth information about user behavior.  Also, Universal Analytics enabled tracking the same user across multiple devices through its addition of the User-ID feature, which "associate[s] a persistent ID for a single user with that user's engagement data from one or more sessions initiated from one or more devices."

72.     In 2020, Google launched Google Analytics 4, a platform combining Google Analytics with Firebase to analyze both app and web activity.

73.     Since launching Google Analytics, Google has become one of the most popular web analytics platforms on the internet.  Indeed, Google had a $62.6 billion increase in advertising revenues in 2021, compared to 2020, after launching its most recent version of Google Analytics.

74.     Google touts Google Analytics as a marketing platform that offers "a complete understanding of your customers across devices and platforms."[33]  It allows companies and advertisers that utilize it to "understand how your customers interact across your sites and apps, throughout their entire lifestyle," "uncover new insights and anticipate future customer actions with Google's machine learning to get more value out of your data," "take action to optimize marketing performance with integrations across Google's advertising and publisher tools," and "quickly analyze your data and collaborate with an easy-to-use interface and shareable reports."[34]

75.     Google Analytics is incorporated into third-party websites and apps, including the Website, by adding a small piece of JavaScript measurement code to each page on the site—even when Hippo's applicants are applying for insurance products.  This code immediately intercepts a user's interaction with the webpage every time the user visits it, including what pages they visit and what they click on.  The code also collects PII, such as IP addresses and device information related to the specific computing device a consumer is using to access a website.  The device information intercepted by Google includes the applicant's operating system, operating system version, browser, language, and screen resolution.

76.     In other words, when interacting with the Website, an HTTP Request is sent to Hippo's server, and that server sends an HTTP Response including the Markup that displays the website visible to the applicant and Source Code, including Google Analytics.

77.     Thus, Defendants are essentially handing their applicants a tapped device.  Once the webpage is loaded onto the applicant's browser, the software-based wiretap is quietly waiting for private communications on the Website to trigger the tap, which intercepts those communications intended only for Defendants, and transmits those communications to third parties like Google.

78.     Once Google's software code collects the data intercepted from the Website, it packages the information and sends it to Google Analytics for processing.  Google Analytics enables the company or advertiser to customize the processing of the data, such as applying filters.  Once the data is processed, it is stored on a Google Analytics database and cannot be changed.

---

[33] *Analytics*, GOOGLE, https://marketingplatform.google.com/about/analytics/.
[34] *Id.*

79.     After the data has been processed and stored in the database, Google uses this data to generate reports to help analyze the data from the webpages.  These include reports on acquisition (e.g., information about where your traffic originates, the methods by which users arrive at your site or app, and the marketing efforts you use to drive traffic), engagement (e.g., measure user engagement by the events and conversion events that users trigger and the web pages and app screens that user visits, and demographics (e.g., classify your users by age, location, language, and gender, along with interests they express through their online browsing and purchase activities).

80.     In addition to using the data collected through Google Analytics to provide marketing and analytics services, Google also uses the data collected through Google Analytics to improve its ad targeting capabilities and data points on users.

81.     The Website utilizes Google's pixel and SDK.  As a result, Google intercepted applicants' interactions on the Website, including their PII and PHI. Google received at least "Custom Events" and URLs that disclosed the financial products each applicant was applying to. Google also received additional PII, including the applicants' IP address, device information, and User-IDs.

82.     For example, the Website utilizes Google's "cid" or "Client ID" function to identify consumers as they navigate the Website.[35]

83.     In addition to User-IDs, upon receiving information from the Website, Google also utilizes a "browser-fingerprint" to personally identify consumers.  A browser-fingerprint is information collected about a computing device that is used to identify the specific device.

84.     These browser-fingerprints are used to uniquely identify individual users when a computing device's IP address is hidden, or cookies are blocked and can provide a wide variety of data.

85.     As Google explained, "[w]ith fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they

---

[35] Eduard Kozakov, *What Is Google Client ID In GA4: Detailed Setup Guide For 2024*, Owox, https://www.owox.com/blog/use-cases/google-analytics-client-id.

have installed to generate a unique identifier which can then be used to match a user across websites."[36]

86.     The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[37]  Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.

87.     In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[38]

88.     Browser-fingerprints are personal identifiers.  Google can collect browser-fingerprints from Website visitors.

89.     As enabled by Defendants, Google collects vast quantities of consumer data through its tracking technologies.

90.     Due to the vast network of consumer information held by Google, it is able to match the IP addresses, device information, and User-IDs it intercepts and link such information to an individual's specific identity.

91.     Google then utilizes such information for its own purposes, such as targeted advertising.

**C.     How Defendants Disclosed Plaintiff's and Class Members' Protected Personally Identifiable Information and Financial Information Through the LinkedIn Insight Tag and Google Analytics**

92.     Hippo owns and operates the www.hippo.com Website, where it encourages applicants to request a quote for insurance coverage.

93.     Defendants' questionnaire is part of the Website at issue in this action.

[36] Justin Schuh, *Building a more private web*, GOOGLE, https://blog.google/products/chrome/building-a-more-private-web/.

[37] Chris Hauk, *What Is Browser Fingerprinting? How It Works And How To Stop It*, PIXEL PRIVACY, https://www.pixelprivacy.com/resources/browser-fingerprinting.

[38] Yinzhi Cao, Song Li & Erik Wijmans, *(Cross-)Browser Fingerprinting via OS and Hardware Level Features* (Network & Distributed Sys. Symp., 2017) https://www.ndss-symposium.org/wp-content/uploads/2017/09/ndss2017_02B-3_Cao_paper.pdf.

94.     The questionnaire is portrayed to Website visitors to receive a quote of Hippo's home insurance.

95.     Defendants employed the services of the Third Parties and their Pixels on each and every page of the questionnaire to track users' responses to the questions and send those responses to the Third Parties so the Third Parties could analyze the information and target users with advertising based on those answers.

96.     The images herein show the series of questions given to Website visitors when they navigate to the Website.  Each of the trackers are installed on each page of the questionnaire, collecting information from users who answer these questions.

97.     At all relevant times Defendants' Website utilized the LinkedIn Insight Tag and Google tracking technologies.

98.     Through the LinkedIn Insight Tag and Google tracking technologies, Defendants disclosed their applicants' identities and online activity, including information related to consumers requesting an insurance quote, with two of the world's largest technology companies for targeted advertising purposes.

*(i) LinkedIn Insight Tag's Interceptions on Defendant's Website*

99.     Once a prospective customer enters the Website, they are prompted with a link to the questionnaire to receive a quote for home insurance.  *See* Figure 1.  The information from this and the following pages are transmitted to Hippo and simultaneously intercepted by the LinkedIn trackers installed on the page.  *See* Figure 2.  Figure 2 shows that the LinkedIn trackers intercept when a user "clicks" the "Quote in 60 Seconds" button on Defendants' Website.

**Figure 1:**



//

//

//

//

//

**Figure 2:**

```
    "url": "https://hippo.com/",
    "pageTitle": "Homeowners Insurance - Get a Quote in 60 Seconds -
Hippo",
    "websiteSignalRequestId": "cdca90fb-b17f-010b-310d-c8c03bd472d4",
    "isTranslated": false,
    "liFatId": "",
    "liGiant": "",
    "misc": {
        "psbState": -4
    },
    "isLinkedInApp": false,
    "hem": null,
    "signalType": "CLICK",
    "href": "",
    "domAttributes": {
        "elementSemanticType": null,
        "elementValue": null,
        "elementType": "button",
        "tagName": "BUTTON",
        "backgroundImageSrc": null,
        "imageSrc": null,
        "imageAlt": null,
        "innerText": "Quote in 60 Seconds",
```

100.    The questionnaire asks several questions related to private and personally identifiable information to provide insurance recommendations to consumers and collect information related to insuring them.  Through the LinkedIn trackers installed on the Website, Third Parties intercept all responses entered by consumers, as shown below.

101.    Hippo's questionnaire continues by asking consumers their address.  *See* Figure 3. This information, including the house number, is then transmitted to LinkedIn through the trackers installed on the Website.  *See* Figure 4.

//

//

//

//

**Figure 3:**



**Figure 4:**

```
    "domain": "quote.hippo.com",
    "url":
"https://quote.hippo.com/?street=15664+Kalisher+Street&city=Los+Angeles&st
ate=ca&zip=91344",
    "pageTitle": "Homeowners Insurance - Get a Quote in 60 Seconds -
Hippo",
    "websiteSignalRequestId": "3628f359-7056-a610-b863-0feddcbff6ee",
    "isTranslated": false,
    "liFatId": "",
    "liGiant": "",
    "misc": {
        "psbState": -4
    },
    "isLinkedInApp": false,
```

102.    Hippo's questionnaire then asks consumers the type of coverage they are looking for, with three options. *See* Figure 5. This information is then transmitted to LinkedIn through the trackers installed on the Website. *See* Figure 6.

**Figure 5:**



**Figure 6:**

```
    "domain": "quote.hippo.com",
    "url": "https://quote.hippo.com/preferences",
    "pageTitle": "Homeowners Insurance - Get a Quote in 60 Seconds -
Hippo",
    "websiteSignalRequestId": "a399402c-06e8-615a-ec79-163177432fae",
    "isTranslated": false,
    "liFatId": "",
    "liGiant": "",
    "misc": {
        "psbState": -4
    },
    "isLinkedInApp": false,
    "hem": null,
    "signalType": "CLICK",
    "href": "",
    "domAttributes": {
        "elementSemanticType": null,
        "elementValue": null,
        "elementType": "button",
        "tagName": "BUTTON",
        "backgroundImageSrc": null,
        "imageSrc": null,
        "imageAlt": null,
        "innerText": "Basic\n\nMore affordable coverage based on local
requirements.",
```

103.    Hippo's questionnaire then asks consumers whether the type of property for which they are seeking insurance is a house or a condo.  *See* Figure 7.  This information is then transmitted to LinkedIn through the trackers installed on the Website.  *See* Figure 8.

**Figure 7:**



**Figure 8:**

```
"domain": "quote.hippo.com",
"url": "https://quote.hippo.com/product-select",
"pageTitle": "Homeowners Insurance - Get a Quote in 60 Seconds -
Hippo",
"websiteSignalRequestId": "f3008e09-72bd-1b48-215d-1dcf345bb79a",
"isTranslated": false,
"liFatId": "",
"liGiant": "",
"misc": {
    "psbState": -4
},
"isLinkedInApp": false,
"hem": null,
"signalType": "CLICK",
"href": "",
"domAttributes": {
    "elementSemanticType": null,
    "elementValue": null,
    "elementType": "button",
    "tagName": "BUTTON",
    "backgroundImageSrc": null,
    "imageSrc": null,
    "imageAlt": null,
    "innerText": "House\n\nThis is a single-family home, townhouse, or
duplex you own, and you are listed on the deed.",
```

104.    Next, Hippo's questionnaire asks about who is living at the property.  *See* Figure 9. This information is then transmitted to LinkedIn through the trackers installed on the Website.  *See* Figure 10.

**Figure 9:**



**Figure 10:**

```
"domain": "quote.hippo.com",
"url": "https://quote.hippo.com/occupants",
"pageTitle": "Homeowners Insurance - Get a Quote in 60 Seconds -
    Hippo",
"websiteSignalRequestId": "e3eaa3ba-849c-3385-8fbb-fe952b0cb120",
"isTranslated": false,
"liFatId": "",
"liGiant": "",
"misc": {
    "psbState": -4
},
"isLinkedInApp": false,
"hem": null,
"signalType": "CLICK",
"href": "",
"domAttributes": {
    "elementSemanticType": null,
    "elementValue": null,
    "elementType": "button",
    "tagName": "BUTTON",
    "backgroundImageSrc": null,
    "imageSrc": null,
    "imageAlt": null,
    "innerText": "Me\n\nI am the owner of this house and I live in it
full time.",
```

105.    Hippo's questionnaire then asks consumers when they would like to start their policy.  *See* Figure 11.  This information is then transmitted to LinkedIn through the trackers installed on the Website.  *See* Figure 12.

**Figure 11:**



**Figure 12:**

```
    "domain": "quote.hippo.com",
     "url": "https://quote.hippo.com/policy-start",
     "pageTitle": "Homeowners Insurance – Get a Quote in 60 Seconds –
Hippo",
     "websiteSignalRequestId": "904943a4-b90f-3f00-684d-baac795ece03",
     "isTranslated": false,
     "liFatId": "",
     "liGiant": "",
     "misc": {
        "psbState": -4
     },
     "isLinkedInApp": false,
     "hem": null,
     "signalType": "CLICK",
     "href": "",
     "domAttributes": {
        "elementSemanticType": null,
        "elementValue": null,
        "elementType": "button",
        "tagName": "BUTTON",
        "backgroundImageSrc": null,
        "imageSrc": null,
        "imageAlt": null,
        "innerText": "A few weeks from now",
```

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    27

106.    With the questionnaire complete, Hippo produces a page comparing multiple quotes, each with a "request call" button.  *See* Figure 13.  If a consumer clicks on any of these buttons, that information is transmitted to LinkedIn through the trackers installed on the Website. *See* Figure 14.

**<u>Figure 13:</u>**



//
//
//
//
//
//
//
//
//
//
//

**Figure 14:**

```
    "domain": "quote.hippo.com",
    "url": "https://quote.hippo.com/compare",
    "pageTitle": "Homeowners Insurance - Get a Quote in 60 Seconds -
Hippo",
    "websiteSignalRequestId": "c7789b15-ff68-2cb0-f2e4-346ad04ea017",
    "isTranslated": false,
    "liFatId": "",
    "liGiant": "",
    "misc": {
        "psbState": -4
    },
    "isLinkedInApp": false,
    "hem": null,
    "signalType": "CLICK",
    "href": "",
    "domAttributes": {
        "elementSemanticType": null,
        "elementValue": null,
        "elementType": null,
        "tagName": "BUTTON",
        "backgroundImageSrc": null,
        "imageSrc": null,
        "imageAlt": null,
        "innerText": "Request call",
```

107.    Additionally, the Website produces a pop-up with another button where a consumer can request a call from an agent. *See* Figure 15. Again, if a consumer clicks on this button, that information is transmitted to LinkedIn through the trackers installed on the Website. *See* Figure 16.

//

//

//

//

//

//

//

**Figure 15:**



**Figure 16:**

```
    "domain": "quote.hippo.com",
    "url": "https://quote.hippo.com/compare",
    "pageTitle": "Homeowners Insurance - Get a Quote in 60 Seconds -
Hippo",
    "websiteSignalRequestId": "171f37c3-35d7-7eb6-81f6-bf0d560d46c2",
    "isTranslated": false,
    "liFatId": "",
    "liGiant": "",
    "misc": {
        "psbState": -4
    },
    "isLinkedInApp": false,
    "hem": null,
    "signalType": "CLICK",
    "href": "",
    "domAttributes": {
        "elementSemanticType": null,
        "elementValue": null,
        "elementType": null,
        "tagName": "BUTTON",
        "backgroundImageSrc": null,
        "imageSrc": null,
        "imageAlt": null,
        "innerText": "Request",
```

*(ii) Google Tracking Technologies' Interceptions on Defendant's Website*

108.    As an additional example, the below screenshots show that Hippo discloses much of the same information (*e.g.*, the consumer's home address and the fact that the consumer is requesting an insurance quote) to Google.  *See* Figures 17-18.

**Figure 17:**

109.    As applicants progress through their insurance applications, Defendants disclose additional information to Google, such as the type of property they reside in:

//

//

**<u>Figure 18:</u>**

| Query String Parameters | View source | View URL-encoded |
|---|---|---|
| random | 1750799790543 | |
| cv | 11 | |
| fst | 1750799790543 | |
| bg | ffffff | |
| guid | ON | |
| async | 1 | |
| gtm | 45be56n0v9162409652za200zb72734075 | |
| gcd | 13l3l3l3l1l1 | |
| dma | 0 | |
| tag_exp | 101509157~103116026~103200004~103233427~103351869~103351871~104528500~104684204~104684207~8208 | |
| u_w | 2560 | |
| u_h | 1440 | |
| url | https://quote.hippo.com/your-condo | |
| ref | https://www.hippo.com/ | |
| hn | www.googleadservices.com | |
| frm | 0 | |
| tiba | Homeowners Insurance - Get a Quote in 60 Seconds - Hippo | |
| npa | 0 | |
| pscdl | noapi | |
| auid | 560718965.1748609574 | |
| uaa | x86 | |
| uab | 64 | |
| uafvl | Google%20Chrome;137.0.7151.120|Chromium;137.0.7151.120|Not%2FA)Brand;24.0.0.0 | |
| uamb | 0 | |
| uam | | |
| uap | Windows | |
| uapv | 15.0.0 | |
| uaw | 0 | |
| fledge | 1 | |
| _tu | Cg | |
| data | event=form_submit | |
| rfmt | 3 | |
| fmt | 4 | |

110.    Google is readily able to identify each applicant through its use of User ID's, browser-fingerprinting, and IP addreses.

*        *        *

111.    The information disclosed by Defendants allow LinkedIn and Google to know the identities of specific individuals as well as information related to the insurance services they are receiving.  This allows these companies, including Defendants, to profit from this information for targeted advertising purposes.

112.    When users share their personal information for insurance services, they expect this information to be kept confidential.  Moreover, when consumers seek a specific service from

insurance websites, they also expect the highly sensitive information they provide on their applications to be kept confidential.

113.    Through the above-listed LinkedIn and Google tracking services, which Defendants used via the software code installed, integrated and embedded into the Website, Hippo disclosed its applicants' legally protected information.

114.    Defendants engage in this deceptive conduct for their own profit at the expense of their applicants' privacy.  Such disclosures are an invasion of privacy, lead to harassing targeted advertising, and violate federal and state law.

## VI.    TOLLING

115.    Any applicable statutes of limitations have been tolled by Defendants' knowing and active concealment of its incorporation of the tracking technologies into its Website.

116.    The Pixels were and are entirely invisible to a website visitor.

117.    Through no fault or lack of diligence, Plaintiff and Class members were deceived and could not reasonably discovery Defendants' deception and unlawful conduct.

118.    Plaintiff was ignorant of the information essential to pursue her claims, without any fault or lack of diligence on her part.

119.    Defendant had exclusive knowledge that its Website incorporated the Pixels and yet failed to disclose to customers, including Plaintiff and Class members, that by applying for insurance through the Website, Plaintiff's and Class members' confidential information would be disclosed or released to third parties.

120.    Under the circumstances, Defendants were under a duty to disclose the nature, significance, and consequences of its collection and treatment of customers' information.  In fact, to the present, Defendants have not conceded, acknowledged, or otherwise indicated to their customers that they disclosed or released confidential information to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

121.    Moreover, all applicable statutes of limitations have also been tolled pursuant to the discovery rule.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    33

122.    The earliest that Plaintiff or Class members, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of the Plaintiff's initial complaint in this matter.

123.    Plaintiff first discovered that Defendant had collected and assisted third parties in intercepting her information on or around July 2025 after contacting undersigned counsel and discussing potential claims against Defendant.

## CLASS ALLEGATIONS

124.    Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Classes:

**Nationwide Class:** All natural persons in the United States who, during the class period, maintained a LinkedIn and/or Google account and requested an insurance quote or purchased an insurance policy on the Website.

**California Subclass:** All natural persons in the State of California who, during the class period, maintained a LinkedIn and/or Google account and requested an insurance quote or purchased an insurance policy on the Website.

125.    Plaintiff reserves the right to modify the Class definitions, including by using subclasses, as appropriate based on further investigation and discovery obtained in the case.

126.    The following people are excluded from the Classes: (1) any Judge presiding over this action and members of their family; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest (including current and former employees, officers, or directors); (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

127.    **Numerosity:** The number of persons within the Classes is substantial and believed to amount to thousands of persons. It is, therefore, impractical to join each member of the Classes as a named plaintiff. Further, the size and relatively modest value of the claims of the individual

members of the Classes render joinder impractical.  Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation.  Moreover, the Classes are ascertainable and identifiable from Defendants', LinkedIn's, and Google's records.

128.    **Commonality and Predominance:** There are well-defined common questions of fact and law that exist as to all members of the Classes and that predominate over any questions affecting only individual members of the Classes.  These common legal and factual questions, which do not vary between members of the Classes, and which may be determined without reference to the individual circumstances of any Class member, include, but are not limited to, the following: whether Defendants violated the ECPA, the CIPA, and whether Plaintiff and the proposed Class members are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

129.    **Typicality:** The claims of the named Plaintiff are typical of the claims of the Classes because the named Plaintiff, like all other class members, visited the Website and had his confidential electronic communications intercepted and disclosed to LinkedIn and Google through LinkedIn's Insight Tag and Google's tracking technologies.

130.    **Adequate Representation:** Plaintiff is an adequate representative of the Classes because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously.  The interests of members of the Classes will be fairly and adequately protected by Plaintiff and his counsel.

131.    **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Classes.  Each individual member of the Classes may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                         35

presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CAUSES OF ACTION

### COUNT I
**Violation of the Electronic Communications Privacy Act**
**18 U.S.C. § 2511, *et seq.***

132.    Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

133.    Plaintiff brings this claim against Defendants individually and on behalf of the members of the Class.

134.    The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

135.    The ECPA protects both sending and the receipt of communications.

136.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

137.    The transmission of Plaintiff's PII and financial information to Defendants' Website qualify as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

138.    The transmission of PII and financial information between Plaintiff and Class Members and Defendants' Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    36

139.    The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication."  18 U.S.C. 18 U.S.C. § 2510(8).

140.    The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

141.    The ECPA defines "electronic, mechanical, or other device," as "any device…which can be used to intercept a[n]…electronic communication[.]"  18 U.S.C. § 2510(5).

142.    The following instruments constitute "devices" within the meaning of the ECPA:

a.    The computer codes and programs Defendants, LinkedIn, and Google used to track Plaintiff and Class Members communications while they were navigating the Website;

b.    Plaintiff's and Class Members' browsers;

c.    Plaintiff's and Class Members' mobile devices;

d.    Defendants', LinkedIn's, and Google's web and ad servers;

e.    The plan the Defendants, LinkedIn, and Google carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website.

143.    Plaintiff and Class Members' interactions with Defendants' Website are electronic communications under the ECPA.

144.    By utilizing and embedding the tracking technology provided by LinkedIn and Google on its website, Defendants intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class Members in violation of 18 U.S.C. § 2511(1)(a).

145.    Specifically, Defendants intercepted—in real time—Plaintiff's and Class Members' electronic communications via the tracking technology provided by LinkedIn and Google on their website, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' PII and financial information to LinkedIn and Google.

146. Defendants intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class Members regarding PII, including their identities and information related to the specific financial product they were applying for, as well as information related to their home address and housing status. This confidential information is then monetized for targeted advertising purposes, among other things.

147. By intentionally disclosing or endeavoring to disclose Plaintiff's and Class Members' electronic communications to LinkedIn through the LinkedIn Insight Tag and to Google through Google's tracking technologies, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(c).

148. By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(d).

149. Defendants intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, the GLBA, CalFIPA, and invasion of privacy, among others.

150. The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State. Here, as alleged above, Defendants violated a provision of the Gramm-Leach-Bliley Act, 16 C.F.R. § 313. This provision imposes a criminal penalty for knowingly disclosing "nonpublic personal information" to a third party. GLBA defines nonpublic personal information as:

> Any information that is not publicly available and that: a consumer provides a financial institution to obtain a financial product or service from the institution; results from a transaction between the consumer and the institution involving a financial product or service; or a

financial institution otherwise obtains about a consumer in connection with providing a financial product or service.[39]

151.    Plaintiff's information that Defendants disclosed to LinkedIn and Google qualifies as nonpublic personal information (including information related to their home address and housing status), and Defendants violated Plaintiff's and Class Members' expectations of privacy. Such conduct constitutes tortious and/or criminal conduct through a violation of 16 C.F.R. § 313. Defendants specifically used the tracking technology provided by LinkedIn and Google to track and utilize Plaintiff's and Class Members' PII for financial gain.

152.    Defendants were not acting under the color of law to intercept Plaintiff's and Class Members' wire or electronic communications.

153.    Plaintiff and Class Members did not authorize Defendants to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy. Plaintiff and Class Members, all of whom are users of the Website, had a reasonable expectation that Defendants would not redirect their communications to LinkedIn and Google without their knowledge or consent.

154.    The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. § 2511(1), *et seq*.

155.    As a result of each and every violation thereof, on behalf of himself and the Class, Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. § 2511, *et seq*. under 18 U.S.C. § 2520.

### COUNT II
### Violation Of The California Invasion Of Privacy Act,
### Cal. Penal Code § 631(a)

156.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

157.    Plaintiff brings this claim against Defendants individually and on behalf of the members of the California Subclass.

---

[39] 16 C.F.R. § 313

158.    CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978).  Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

159.    CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email.  *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

160.    Both the LinkedIn Insight Tag and Google tracking technologies are a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

161.    LinkedIn and Google are "separate legal entit[ies] that offer[] [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, LinkedIn and Google have the capability to use and do use the wiretapped information for their own purposes. Accordingly, LinkedIn and Google are both a third party to any communication between Plaintiff and California Subclass Members, on the one hand, and Defendants, on the other. *Id*. at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

162.    At all relevant times, LinkedIn and Google willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiff and members of the California Subclass, on the one hand, and Defendants, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

163.    At all relevant times, LinkedIn and Google used or attempted to use the communications intercepted to, *inter alia*, monitor and improve their products and services.

164.    At all relevant times, Defendants aided, agreed with, employed, permitted, or otherwise enabled LinkedIn and Google to wiretap Plaintiff and members of the California Subclass through the LinkedIn Insight Tag and Google tracking technologies and to accomplish the wrongful conduct at issue here.

165.    Plaintiff and members of the California Subclass did not provide their prior consent LinkedIn's and Google's intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff's and California Subclass members' electronic communications. Nor did Plaintiff and California Subclass members provide their prior consent to Defendants aiding, agreeing with, employing, permitting, or otherwise enabling LinkedIn's and Google's conduct.

166.    The wiretapping of Plaintiff and California Subclass members occurred in California, where Plaintiff and California Subclass members accessed the Website and where the LinkedIn Insight Tag and Google tracking technologies —as enabled by Defendants—routed Plaintiff's and California Subclass members' electronic communications to their servers.

167.    Pursuant to Cal. Penal Code § 637.2, Plaintiff and California Subclass members have been injured by Defendants' violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendants' violations of CIPA § 631(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

(a)    For an order certifying the Classes, naming Plaintiff as representative of the Classes, and naming Plaintiff's attorneys as Class Counsel to represent the Classes;

(b)    For an order declaring that Defendants' conduct violates the statutes referenced herein;

(c)    For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(d)    For actual, compensatory, statutory, and/or punitive in amounts to be determined by the Court and/or jury;

(e)    For prejudgment interest on all amounts awarded;

(f)    For an order of restitution and all other forms of equitable monetary relief;

(g)    For injunctive relief as pleaded or as the Court may deem proper; and

(h)    For an order awarding Plaintiff and the Classes their reasonable attorneys' fees, expenses, and costs of suit.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated:  July 29, 2025                    Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:  /s/ L. Timothy Fisher

L. Timothy Fisher (State Bar No. 191626)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    42

Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com
            jwilner@bursor.com

*Counsel for Plaintiff*